FILED

12/23/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2019 Session

## STATE OF TENNESSEE v. JAMES R. BAYSINGER

**Appeal from the Criminal Court for Anderson County**
**No. B7C00320    Donald R. Elledge, Judge**

_____

### No.  E2018-02295-CCA-R3-CD

_____

The Defendant, James R. Baysinger, pleaded guilty to reckless homicide, a Class D felony.  *See* T.C.A. § 39-13-215 (2018).  Pursuant to the plea agreement, the trial court was to determine the length and the manner of service.  The trial court sentenced the Defendant to two years and ordered him to serve five months, followed by four years' probation.  On appeal, the Defendant contends that the court erred by denying his requests for judicial diversion and full probation.  We reverse the judgment of the trial court and remand the case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Joseph A. Fanduzz, Knoxville, Tennessee, for the appellant, James R. Baysinger.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Dave S. Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the 2015 accidental drowning death of a five-year-old boy who had been in the Defendant's care at the time of the incident.  The Defendant was indicted for reckless homicide and aggravated child abuse or neglect.  Pursuant to the plea agreement, the Defendant pleaded guilty to reckless homicide, the State dismissed the remaining charge, and the trial court would determine the length and the manner of service of the sentence.  The guilty plea transcript is not included in the appellate record.

At the sentencing hearing, the presentence report was received as an exhibit. The report reflected that the sixty-four-year-old Defendant did not have any previous convictions. The report showed that the Defendant obtained a two-year degree in electronic engineering. The Defendant denied having received mental-health treatment, alcohol or drug treatment, and family therapy. He reported having high blood pressure and mild arthritis. The Defendant had been raised by his mother and his grandparents, after his father left when he was age five. The Defendant had two adult sons. The Defendant's employment history showed that he received an honorable discharge from the United States Air Force and that he had continuous employment from 1972 to the time of the presentence investigation. He had worked for Stevens Beechcraft, Hammond House of Music, and Tennessee Valley Authority. The report reflected that the Defendant's risk of recidivism was "minimal."

The Defendant told the presentence investigator that on June 24, 2015, he agreed to care for the victim and his siblings at the children's home at the request of their mother. The Defendant stated that, at some point, he could no longer see the victim, that the other children identified places the victim liked to hide, and that he looked for the victim in those places. The Defendant said that after he could not find the victim, he sent a text message to the victim's mother, who responded that the victim "had done this before." The Defendant said that the victim's mother called him on the telephone, told him she was returning home, and asked him not to do anything until she arrived. The Defendant said that when the victim's mother arrived, she told him and the other children to "fan out and yell" the victim's name, that the victim's mother threatened to call the police if the victim did not come out from hiding, and that she called the police at some point. The Defendant stated that several hours after the police arrived, the victim was found in the creek. The Defendant said, "I was utterly devastated because I cared a lot for this little boy, and he loved me very much. I was in a state of shock for weeks, crying [every day] without warning. I am so very sorry that this ever happened[.]"

The victim's mother told the presentence investigator that she and the Defendant were friends and that she asked the Defendant to care for four of her five children, including the victim who had "special needs." The victim's mother said that she told the Defendant to keep the children inside until she returned home. She said she received a text message from the Defendant stating that he could not find the victim. She said that although the victim had a "habit" of hiding, her other children reported that the Defendant had been working on his computer. The victim's mother reported that since the victim's death she attended counseling once per week, had post-traumatic stress disorder (PTSD), and suffered from depression. She said that she previously suffered from anxiety and suicidal thoughts. The victim's mother stated that "some" of her other children attended counseling for depression and PTSD because of the victim's death. The victim's mother stated that the Defendant did not "seem to show the remorse . . . [of] an average person," although the Defendant had asked her to forgive him and told her he wanted to help her cope with the loss of the victim.

Anderson County Sheriff's Investigator Sean Flynn testified that the police had been looking for the victim for several hours before Investigator Flynn arrived at the scene around 7:00 p.m. He recalled deputies initially responded to the scene around 1:00 p.m. Investigator Flynn said that several units were involved, along with agencies from a neighboring county, in searching for the victim. He noted that several officers who were involved in the search were familiar with the victim and the victim's family. Investigator Flynn said he spoke to the victim's mother, who said that the victim might have suffered from "some kind of disability."

Investigator Flynn testified that, at the request of the victim's mother, the Defendant arrived at the victim's home the night before the incident. Investigator Flynn said that the Defendant was asked to care for four children the next day in order for the victim's mother to conduct business at the courthouse. Investigator Flynn said that the Defendant said the victim's mother left the home around 10:30 a.m. Investigator Flynn said the Defendant reported that the victim went outside, that the Defendant sat at the kitchen table, and that the Defendant was "involved" with other children inside the kitchen. Investigator Flynn said that he sat at the kitchen table on a chair identified by the Defendant, that Investigator Flynn could see into the backyard from this chair, and that Investigator Flynn could see a hammock and wading pool, where the Defendant had seen the victim. Investigator Flynn said that the Defendant reported seeing the victim for the last time around the hammock at 11:00 or 11:05 a.m.

Investigator Flynn testified that, when the Defendant lost sight of the victim, the Defendant said he looked for the victim in an outbuilding. Investigator Flynn said that the Defendant sent the victim's mother a text message at 11:35 a.m. relative to the places the victim liked to hide. Investigator Flynn said that the victim liked to hide and that the victim's mother identified the victim's favorite places to hide. Investigator Flynn said that the Defendant reported having all of the children assist in looking for the victim and that the Defendant sent another text message to the victim's mother at 11:49 a.m. stating that they had not found the victim. Investigator Flynn said that the victim's mother sent a text message to the Defendant stating that she was on her way home and that she arrived home at 12:00 p.m. Investigator Flynn said the Defendant stated that he and the victim's mother looked for the victim before calling the sheriff's office.

Investigator Flynn testified that the victim was found about 250 yards from the home submerged beneath five feet of creek water. Investigator Flynn said that the victim had old abrasions on his elbow, ankle, and jaw and that he saw nothing to suggest "foul play." Investigator Flynn said that the foam around the victim's nostrils and mouth was indicative of drowning. Investigator Flynn described the creek as having an area in which the water accumulated to form a pond-like area and said that children used a rope swing to play in the water. He said that a partially submerged tree went from the shoreline of the pond to the rope swing. He recalled that the victim wore swimming trunks, which were on backward.

-3-

On cross-examination, Investigator Flynn testified that although the Defendant had been around the children previously, the Defendant had never babysat them. Investigator Flynn agreed that the Defendant was not a paid caregiver and that the Defendant cared for the children on the day of the incident to help the victim's mother. Investigator Flynn agreed that the victim's mother needed the Defendant's assistance because she was having problems with a previous caregiver, who had been a tenant.

Investigator Flynn testified that he was unaware of any previous Department of Children's Services (DCS) reports stating that the victim had been missing previously. Investigator Flynn acknowledged, though, that the sheriff's department had been involved in searching for the victim about one month before the present incident. Investigator Flynn agreed the victim was found the same day the victim disappeared in the previous incident, but he did not know the circumstances of the recovery. Investigator Flynn stated that the Defendant was cooperative and "tried his best to help out with the investigation." He said the ages of the other children at the home were four, seven, and seventeen.

Upon questioning by the trial court, Investigator Flynn testified that the Defendant began looking for the victim at 11:05 a.m. and that the Defendant sent a text message to the victim's mother at 11:35 a.m. On recross-examination, Investigator Flynn stated that he did not know how the Defendant knew the victim had been missing previously and agreed that the victim's mother could have provided the information.

The victim's mother testified that the home was located in a small rural community with no nearby neighbors. She said that she met the Defendant through the Defendant's former girlfriend and that she and the Defendant were friends. She stated that she asked the Defendant to come to her home the night before the incident because she had been receiving threats from a former tenant and because the Defendant made her feel safe. She said that she left home the next morning to go to the courthouse to obtain a restraining order against the former tenant. She said that she had planned to take all of her children with her to the courthouse but that the Defendant suggested he care for the children. She agreed but said her fifteen-year-old daughter went to the courthouse. She recalled that the Defendant had spent time with the children previously, which included camping with the children about one week before the incident. She said the Defendant and the children knew each other well.

The victim's mother testified that she "felt" the victim had "mild Asperger's, or something like that" and that the victim's doctor was "on the cusp" of referring the victim to a pediatric neurologist. She said the Defendant knew "what kind of child" the victim had been. She said the victim was loving, curious, and loved the outdoors. When asked if the victim "liked to wander off," she said that "[e]very once in a while he would hide in a bush and it wouldn't be very long, we would always call out for [the victim] even if it was five minutes, we always knew to call out for [him] and look for [him] all the time."

-4-

The victim's mother testified that she had been away from home approximately forty-five minutes when she received the Defendant's text message stating he could not find the victim. She said that, after she received the message, she immediately returned home. She said that she looked for the victim briefly and called 9-1-1 when she did not find him. She said that she would "never get over" the victim's death and that she and one of her daughters suffered from PTSD as a result of the victim's death. She agreed that the Defendant did not intend to kill the victim but said that she "ask[ed]" the Defendant to keep the children inside the home "because of what was going on that morning." She said that the victim could dress himself but that she did not recall what the victim wore when she left home on the day of the incident. She said that the victim was buried in Monterey, Tennessee, where the victim's father's family lived.

On cross-examination, the victim's mother testified that she learned the former tenant had been "addicted to substances" and that, as a result, she made the tenant leave the home. She recalled the tenant was angry with her for making him leave and said that he harassed her. She reviewed the text messages exchanged between her and the Defendant on the day of the incident and agreed the messages were accurate. She said that the victim liked to hide in the bushes because he liked to look at birds. She agreed that the Defendant asked in the messages if the victim would go to the creek. She said that although the victim

> had a tendency to veer around the house, he never usually went too extremely far. I really absolutely thought that he was in the woods lost, hiding, cold, hungry. And it really never dawned on me that he went down to the creek up until [the police] told me. I just never thought that that would happen.

She agreed she called the police about one and one-half months before this incident because she could not find the victim. She said that, when she could not find the victim, she drove to the children's school because she thought the victim could have ridden the school bus with her other children. She said the police ultimately found the victim in the bushes in the backyard. She agreed DCS became involved but denied anyone discussed ways to prevent future incidents. When asked if she told the Defendant that the victim had been missing previously, that DCS became involved, and that the police ultimately found the victim hiding in the bushes, she stated that the Defendant "knew that." She said that she and the Defendant had been friends "throughout the whole thing" and that she "didn't keep anything from him." She did not provide an answer when she was asked to clarify if she told the Defendant about the previous incident involving the police and DCS before leaving home on the day of the incident.

The text messages exchanged between the Defendant and the victim's mother reflect that, at 11:35 a.m., the Defendant sent a message stating that the victim "must be hiding" and asked if the victim's mother knew "where he might be." The message stated

-5-

that "[w]e looked in all the rooms and shed." The victim's mother responded, "Oh gosh.. he's hiding again.. bushes sometimes.. so sorry almost done[.]" Although the time stamp is illegible, the Defendant next message stated that he had looked "everywhere," including the "big barn" and that one of the children had said that the victim sometimes fell asleep when hiding. The victim's mother responded that she was coming home and that "he's done this before so sorry[.]" At 12:06 p.m., the Defendant stated that the victim had not been upset or misbehaving, that he had yelled for the victim, and that he had looked behind all of the bushes, in the shed again, in all of the bedrooms, and in the storage room. The Defendant asked if the victim would go to the creek. The victim's mother did not answer the question but, at 12:14 p.m., she asked if the Defendant had looked inside his van, and the Defendant responded affirmatively six minutes later.

The Defendant read the following statement to the trial court:

> Thank you, Your Honor. Thank you for this opportunity to address the Court. I think of [the victim] often and I feel a great deal of sorrow. This has definitely affected me deeply because he was such a sweet boy and I cared a lot for him. The first several weeks after his accident[,] I was in shock and too emotionally distraught to work. It took me a long time to come to grips with what had happened and my part in it. I am terribly sorry this happened on my watch. I would never intend for anything to happen to anyone like this. I have been filled with sorrow and grief for the past three-and-a-half years. And I feel like this will continue to affect my life in all my future decisions. As much as I wish I could take back that awful day, I have learned to accept my part in this dreadful tragedy knowing there is nothing I can do to erase it. I, therefore, humbly plead with the Court for the chance to somehow make amends if that is possible.

The trial court considered the presentence report, the testimony at the sentencing hearing, and the arguments of counsel. The court found that the Defendant was in "somewhat of a state of shock" at the time of the incident. The court found that it was undisputed that the victim "had a habit of hiding." The court found, based upon the presentence report, that the children reported to the victim's mother that the Defendant had been working on the computer and that, as a result, the victim was able to leave the home. The court found that the victim "was a special needs child" based upon the victim's mother's statement in the presentence report and in her sentencing hearing testimony. The court noted her presentence statement reflected that the Defendant showed little to no remorse and was concerned about the impact of the victim's death on her and the Defendant's relationship. The court was "disturbed" by the statement.

The trial court determined that the Defendant had no previous criminal history and was not a member of a criminal gang organization. The court found that the Defendant obtained an associate's degree in electronic engineering, had good mental health, and did

not have a history of substance abuse. The court found that the Defendant did not have a physical disability, although he suffered from high blood pressure and mild arthritis and took prescribed medications. The court found that he was honorably discharged from the United States Air Force and had a continuous work history.

The trial court found that although the victim's mother told the Defendant to keep all of the children inside the home because "of what was going on" with the former tenant, the Defendant last saw the victim outside at 11:05 a.m. The court found that the Defendant had been working on his computer during this time, that the victim was found wearing his swimming trunks backward, and that the trunks were not put on by an adult. The court "assumed" that the victim put on the trunks when the Defendant was working on his computer. The court found, based upon his spending time with the children previously and the victim's mother's testimony, that the Defendant knew the police had been called to the home previously to search for the victim and knew the victim liked to hide outside in the bushes. The court determined that the Defendant knew about the DCS investigation because the victim's mother stated the Defendant knew about it based upon their friendship. The court found that although the Defendant knew these things, he sat inside the home working on his computer. The court determined that this "tragic, tragic, tragic event . . . could have been stopped but for the serious recklessness" of the Defendant.

The trial court applied enhancement factors (4), (10), (14). *See* T.C.A. § 40-35-114 (2018). The court found that the victim was age five and "had disabilities" and that, as a result, was particularly vulnerable. *See id*. § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"). The court applied factor (10) but gave it "very little weight" because the mens rea of the conviction offense was recklessness and because the Defendant acted with a "high level" of carelessness. *See id*. § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"). The court determined that the Defendant abused a position of private trust because he was trusted to supervise the children when the victim's mother was away from the home. *See id*. § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense[.]").

The trial court stated that it could not consider whether to grant the Defendant's request for judicial diversion because a certificate of eligibility from the Tennessee Bureau of Investigation (TBI) had not been filed with the court. The court, nonetheless, found that the Defendant was eligible to receive diversion and denied the request after considering the circumstances of the offense, which included the Defendant's "gross carelessness . . . to the extent that it resulted in a child's death." The court found that the public was entitled to learn of the Defendant's conviction "because, if not, . . . [the Defendant] has the opportunity, if it is cleared from his record to commit this crime again. If he was careless this time, who is to say he won't do it again." The court

-7-

determined that "it's vitally important that the public . . . that any child be publicly protected . . . . And there is no way if he doesn't have a record that this won't happen again." The court found that granting judicial diversion would not serve the public interest. The court determined that public interest, which included a discussion about the Defendant's amenability to correction, deterrence, and circumstances of the offense weighed against judicial diversion.

The trial court made no additional findings and conclusions, specific to alternative sentencing or otherwise, before announcing the sentence. The court determined that the Defendant was a Range I, standard offender and imposed a two-year sentence. The court ordered the Defendant to serve five months in confinement at 75% service and four years on probation. The court, likewise, ordered the Defendant to visit the victim's gravesite four times per year in lieu of community service. This appeal followed.

As a preliminary matter, we note that although the guilty plea transcript is not included in the appellate record, the record is sufficient for a meaningful review of the issues presented. *See Caudle*, 388 S.W.3d at 279 (holding that when a guilty plea transcript is not present in the appellate record, this court should "determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in [*State v. Bise*, 380 S.W.3d 682 (Tenn. 2012)]"). The testimony at the sentencing hearing provided sufficient factual evidence surrounding the offense.

## I.  Denial of Judicial Diversion

The Defendant contends that the trial court erred in denying judicial diversion, arguing that the court failed to consider all of the relevant factors in making its determination. The State responds that the court did not abuse its discretion by denying diversion.

As a preliminary matter, the appellate record does not contain a certificate from the TBI stating that the Defendant is eligible and qualified to receive judicial diversion. Tennessee Code Annotated second 40-35-313(a)(3)(A) states, "No order deferring further proceedings and placing the defendant on probation . . . may be entered by the court . . . , unless there is attached to it a certificate from the Tennessee bureau of investigation stating that the defendant does not have a prior felony or Class A misdemeanor conviction." The trial court noted at the sentencing hearing that a certificate of eligibility had not been presented to the court but, in any event, rendered findings and conclusions relative to judicial diversion. Likewise, the absence of a certificate was discussed during oral argument before this court. Defense counsel noted that the certificate was not in the appellate record but that counsel had the certificate. The panel stated that the panel would address any motion to supplement the record. On October 2, 2019, the Defendant filed a motion to supplement the record with the "TBI diversion eligibility certificate" because it "was not included" in the appellate record transmitted by the trial court clerk's

-8-

office. On October 3, this court ordered the trial court clerk to supplement the appellate record with the certificate. On October 10, the trial court clerk responded that the certificate "has not been filed" with the clerk's office.

Although the trial court determined that the Defendant qualified for judicial diversion, the transcript reflects that the court did not "have a TBI certificate here today. I can't do any type of judicial diversion unless I have a TBI certificate." The statute requires a TBI certification that a defendant is qualified to receive judicial diversion, and "[w]ithout this certification . . . , the trial court could not grant judicial diversion." *State v. Jonathan Ray Sender*, No. M2009-01713-CCA-R3-CD, 2010 WL 4398720, at *4 (Tenn. Crim. App. Nov. 8, 2010); *see State v. Steven Matthew Messer*, No. E2013-00647-CCA-R3-CD, 2014 WL 259706, at *3 (Tenn. Crim. App. Jan. 22, 2014). Furthermore, this court has concluded that a defendant seeking judicial diversion has "the burden of showing the trial court that the defendant is in fact statutorily qualified for judicial diversion" and that "[u]nless a defendant is qualified, further determinations by the trial court on the issue of granting or denying judicial diversion is pointless." *Id*. Because the record does not contain a TBI certification showing that the Defendant is qualified to receive judicial diversion, appellate consideration of this issue is precluded. The Defendant is not entitled to relief.

## II.    Denial of Full Probation

The Defendant contends that the trial court erred by ordering split confinement, arguing that the court should have ordered full probation because the Defendant did not know the victim had been missing previously and because the nature of the offense does not warrant a denial of full probation. He does not challenge the trial court's application of enhancement factors and the length of his sentence. The State responds that the court did not abuse its discretion by ordering split confinement.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court

is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654. "The guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). The relevant factors for a trial court to consider include a defendant's amenability to correction, social history, criminal history, and physical and mental health, and the need for special and general deterrence. *Id*.; *see State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *see also* T.C.A. § 40-35-103.

The record reflects that the Defendant was eligible for probation because the sentence imposed was less than ten years. *See id*. § 40-35-303(a). Likewise, he was a favorable candidate for probation based upon his standard offender classification, although a trial court is not bound by the advisory sentencing guideline. *See id*. § 40-35-103(1)(A)-(C); 40-35-102(6)(A)-(D). The trial court's findings and conclusions were not specific to probation, but the record reflects that the court denied full probation based upon the Defendant's amenability to correction, the need for deterrence, and the nature of the offense. *See id*. § 40-35-103(1)(B); *see also State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (concluding that when the denial of alternative sentencing is based upon both considerations in 40-35-103(1)(B), the "heightened standard of review" does not apply); *Trotter*, 201 S.W.3d at 654 (concluding that when "the seriousness of the offense forms the [sole] basis for the denial of alternative sentencing, . . . the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement") (internal quotation marks and citation omitted); *State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000) (concluding that deterrence can be the sole basis for the denial of alternative sentencing "when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes").

The undisputed facts reflect that the Defendant was charged with caring for four children, between the ages of four and seventeen, while the victim's mother drove to the courthouse to address an unrelated matter. The victim's mother testified that she told the Defendant to keep the children inside the home while she was gone because of threats she received from a former tenant, but, at some point, the Defendant saw the victim playing in the backyard alone. Although the Defendant could see the victim from the kitchen table at which the Defendant sat, the Defendant lost sight of the victim at 11:05 a.m. The other children reported that the Defendant had been working on his computer. After the Defendant and the other children unsuccessfully searched for the victim inside and outside of the home, the Defendant contacted the victim's mother at 11:35 a.m. The exchange of text messages that followed reflect that the Defendant believed the victim was hiding and asked for direction relative to where to search. The victim's mother stated that the victim was "hiding again," suggested the Defendant look in the bushes, and said the victim had "done this" previously. The Defendant asked if the victim would go down to the creek, but the victim's mother did not answer and directed the Defendant to search his van. After the victim's mother arrived home, she called the police, who found the victim submerged in the creek. The victim wore his swimming trunks backward. Although the victim's mother was dissatisfied with the level of the Defendant's remorse, the Defendant told the presentence investigator that he was "devastated," that he had been in a state of shock for weeks after the victim's death, and that he was sorry that the victim had died.

The record reflects that the Defendant had no previous criminal convictions, and the presentence report reflects that the Defendant's risk for recidivism was "minimal." Likewise, the Defendant had obtained an associate's degree, had continuous employment since his honorable discharge from the United States Air Force, had good social history, and had good physical and mental health. Although the Defendant disputes that he knew about the previous incident occurring about one month before the victim's death in which the victim hid in the bushes outside the home and in which the police and DCS became involved, the victim's mother testified that the Defendant knew about this. However, the text messages from the day of the incident reflect that the victim's mother apologized to the Defendant and that she stated the victim had "done this" previously. In any event, the trial court credited the victim's mother's testimony that the Defendant knew about the previous incident. As a result, the record supports the trial court's determination that the victim's death was "tragic" and was the result of the Defendant's "serious recklessness" and "gross carelessness" and that the victim's death might have been prevented had the Defendant not been working on a computer.

However, the trial court's findings regarding the Defendant's potential for rehabilitation and the public interest are problematic. The court stated that "if [the Defendant] was careless this time, who is to say he won't do it again," that "it's vitally important . . . that any child be publicly protected," and that "there is no way if he doesn't have a record that this won't happen again." The court's statements reflect a

determination that the Defendant was not amenable to correction, despite that it found this incident was a "tragic event," that the Defendant had no previous criminal convictions, that his employment and personal history were good, and that the presentence report reflected that he was unlikely to reoffend. Likewise, the Defendant's statement to the court reflected remorse, sorrow, and responsibility for the victim's death, although the Defendant did not intend for harm to come to the victim. The court's reliance on the public interests to impose a sentence of confinement was related, at least in part, to the court's determination that the Defendant would reoffend if the public remained unaware of the Defendant's conduct. The evidence at the sentencing hearing does not support the trial court's finding regarding the likelihood of recidivism.

Regarding the trial court's reliance on deterrence, a sentence involving confinement may be based upon general deterrence when the evidence shows that "confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses." T.C.A. § 40-35-103(1)(B); *see State v. Nunley*, 22 S.W.3d 282, 286 (Tenn. Crim. App. 1999). The evidence "should 'indicat[e] some special need or consideration relative to that jurisdiction which would not be addressed by the normal deterrence inherent in any criminal activity.'" *Nunley*, 22 S.W.3d at 286 (quoting *State v. Hartley*, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991)). The record does not contain any evidence or information related to the special public need for deterrence in Anderson County regarding "careless" and "reckless" conduct that unintentionally results in the death of a child. Likewise, the record does not contain evidence showing that the Defendant had previously engaged in similar conduct warranting confinement as a specific deterrent against the Defendant's future conduct. To the contrary, the record reflects that the Defendant had been around the victim and his siblings previously without incident and that the Defendant had no previous criminal history. Therefore, the record does not support the trial court's findings regarding deterrence.

The remaining basis for denying full probation was the seriousness of the offense. The record reflects that the trial court's focus was that the Defendant's reckless conduct resulted in the victim's death. However, the fact that the victim died cannot alone support the denial of probation in this case because a death is a general element of reckless homicide. *See State v. Housewright*, 982 S.W.2d 354, 357-58 (Tenn. Crim. App. 1997); *see also* T.C.A. § 39-13-215 ("Reckless homicide is the reckless killing of another."). As this court has previously stated, we "recognize[] the grave nature of crimes that involve the death of another person. However, we also readily acknowledge that we are governed by laws enacted by the legislature." *Housewright*, 982 S.W.2d at 358. The legislature has provided that a defendant sentenced to ten years or less is eligible for alternative sentencing, even if the defendant is convicted of an offense involving the death of the victim. *See* T.C.A. § 40-35-303(a). "[O]ur legislature has specified that the sentence of probation *is* to be considered for certain defendants who commit certain crimes *regardless of the basic elements of those crimes*." *Trent*, 533 S.W.3d at 292. (Emphasis in original). "If trial courts were permitted to deny probation

solely on the basis of the elements of probation-eligible offenses, then the statute providing for probation-eligibility for those offenses would be rendered a nullity." *Id.* Although the trial court determined that the victim's death might have been prevented but for the Defendant's working on the computer, it is insufficient to deny full probation because the Defendant killed someone while engaged in reckless conduct.

The Defendant has not challenged the trial court's application of the enhancement factors, and we acknowledge that the misapplication of a single factor is alone insufficient to vacate a sentence. *See* T.C.A § 40-35-114; *see also Bise*, 380 S.W.3d at 706. However, the record reflects that the court misapplied enhancement factor (10). *See* T.C.A. § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"). The prosecutor argued that the Defendant displayed a "lack of hesitation up to and including his behavior that day . . . [by] not properly supervising the child." The application of factor (10) was based upon the risk to the victim. Our supreme court, though, has stated that "the law has been clear for over twenty years that this enhancement factor is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *Trent*, 533 S.W.3d at 294 (citing *Bingham*, 910 S.W.2d 448, 452-53 (Tenn. Crim. App. 1995)). The record does not contain evidence reflecting that the Defendant's recklessness placed anyone other than the victim at risk.

We likewise note that the record contains insufficient evidence supporting a determination that the victim was particularly vulnerable because of age or of intellectual disabilities. *See* T.C.A. § 40-30-114(4). Our supreme court has concluded that enhancement factor (4) "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). Furthermore, age alone is insufficient to establish a particular vulnerability, and our courts have said that a particular vulnerability is established when the State establishes that a victim is "incapable of resisting, summoning help, or testifying against the perpetrator." *Id.*; *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001). The only testimony regarding the victim's abilities came from the victim's mother, who stated that she "felt" the victim, who was age five, had "mild Asperger's, or something like that." She said that the victim's doctor was "on the cusp" of referring the victim to a pediatric neurologist, but no evidence was presented to the trial court showing how the victim's undiagnosed condition impacted his ability to resist, to summon help, or to provide testimony. She described the victim as loving, curious, and someone who loved the outdoors. When asked if the victim "liked to wander off," she said that "[e]very once in a while he would hide in a bush and it wouldn't be very long, we would always call out for [the victim] . . . , we always knew to call out for [him] and look for [him] all the time." However, this evidence does not show that the victim's age or mental capabilities prevented him from calling for help or would have prevented him from testifying about the Defendant's conduct if the victim had not drowned accidentally.

Furthermore, the record does not reflect that the trial court considered any appropriate mitigating factors, although the Defendant submitted a sentencing memorandum discussing mitigating factors and addressed mitigating factors at the sentencing hearing. T.C.A. § 40-35-113 (2018). Investigator Flynn and the victim's mother testified that the Defendant was cooperative and attempted to help with the police investigation and to find the victim. *See id*. § 40-35-113(10) ("The defendant assisted the authorities in locating or recovering any . . . person involved in the crime[.]"). Furthermore, as we have discussed above, the record supports a determination that the likelihood of recidivism is minimal, and the court determined that this case involved a "tragic event." *See id*. § 40-35-113(11) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]").

As a result of the trial court's errors, the record does not permit the presumption of reasonableness to attach to the trial court's sentencing determinations. In addition to the determinations unsupported by the record, we are concerned that the trial court denied full probation based upon the elements of the offense despite the legislature's providing that reckless homicide is an offense for which a defendant is probation eligible. Therefore, we remand this case to the court for a new sentencing hearing. Furthermore, consideration of judicial diversion may be renewed upon remand if a TBI certification showing that the Defendant is qualified to receive judicial diversion is filed with the court before or during the new sentencing hearing.

In reaching this determination, we have not considered whether the condition of probation that the Defendant visit the victim's gravesite four times per year is authorized by the Sentencing Act. *See id.* § 40-35-303(d); *see also State v. Mathis*, 114 S.W.3d 915, 918 (Tenn. 2003) ("Tennessee does not permit courts to impose punishments that are beyond the bounds of traditional notions of rehabilitation," and conditions of probation must serve either of the two main goals of probation, which include rehabilitating the defendant and providing a deterrent to others.) (internal quotations and citations omitted). The Defendant consented to the condition and has not challenged its application on appeal.

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court. The case is remanded to the trial court for a new sentencing hearing.

_____
ROBERT H. MONTGOMERY, JR., JUDGE